**In re CAREMARK INTERNATIONAL INC. DERIVATIVE LITIGATION.**

**Civil Action No. 13670.**

Court of Chancery of Delaware, New Castle County.

Submitted:  Aug. 16, 1996.
Decided:  Sept. 25, 1996.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington; (Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY; Goodkind Labaton Rudoff & Sucharow, L.L.P., New York City, of Counsel); for Plaintiffs.

Kevin G. Abrams, Thomas A. Beck and Richard I.G. Jones, Jr., of Richards, Layton & Finger, Wilmington; (Howard M. Pearl, Timothy J. Rivelli and Julie A. Bauer, of Winston & Strawn, Chicago, IL, of Counsel), for Caremark International, Inc.

Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington; (William J. Linklater, of Baker & McKenzie, Chicago, IL, of Counsel), for Individual Defendants.

## OPINION

ALLEN, Chancellor.

Pending is a motion pursuant to Chancery Rule 23.1 to approve as fair and reasonable a proposed settlement of a consolidated derivative action on behalf of Caremark International, Inc. ("Caremark"). The suit involves claims that the members of Caremark's board of directors (the "Board") breached their fiduciary duty of care to Caremark in connection with alleged violations by Caremark employees of federal and state laws and regulations applicable to health care providers. As a result of the alleged violations, Caremark was subject to an extensive four year investigation by the United States Department of Health and Human Services and the Department of Justice. In 1994 Caremark was charged in an indictment with multiple felonies. It thereafter entered into a number of agreements with the Department of Justice and others. Those agreements included a plea agreement in which Caremark pleaded guilty to a single felony of mail fraud and agreed to pay civil and criminal fines. Subsequently, Caremark agreed to make reimbursements to various private and public parties. In all, the payments that

Caremark has been required to make total approximately $250 million.

This suit was filed in 1994, purporting to seek on behalf of the company recovery of these losses from the individual defendants who constitute the board of directors of Caremark.[1] The parties now propose that it be settled and, after notice to Caremark shareholders, a hearing on the fairness of the proposal was held on August 16, 1996.

A motion of this type requires the court to assess the strengths and weaknesses of the claims asserted in light of the discovery record and to evaluate the fairness and adequacy of the consideration offered to the corporation in exchange for the release of all claims made or arising from the facts alleged. The ultimate issue then is whether the proposed settlement appears to be fair to the corporation and its absent shareholders. In this effort the court does not determine contested facts, but evaluates the claims and defenses on the discovery record to achieve a sense of the relative strengths of the parties' positions. *Polk v. Good,* Del.Supr., 507 A.2d 531, 536 (1986). In doing this, in most instances, the court is constrained by the absence of a truly adversarial process, since inevitably both sides support the settlement and legally assisted objectors are rare. Thus, the facts stated hereafter represent the court's effort to understand the context of the motion from the discovery record, but do not deserve the respect that judicial findings after trial are customarily accorded.

Legally, evaluation of the central claim made entails consideration of the legal standard governing a board of directors' obligation to supervise or monitor corporate performance. For the reasons set forth below I conclude, in light of the discovery record, that there is a very low probability that it would be determined that the directors of Caremark breached any duty to appropriately monitor and supervise the enterprise. Indeed the record tends to show an active consideration by Caremark management and its Board of the Caremark structures and programs that ultimately led to the compa-

ny's indictment and to the large financial losses incurred in the settlement of those claims. It does not tend to show knowing or intentional violation of law. Neither the fact that the Board, although advised by lawyers and accountants, did not accurately predict the severe consequences to the company that would ultimately follow from the deployment by the company of the strategies and practices that ultimately led to this liability, nor the scale of the liability, gives rise to an inference of breach of any duty imposed by corporation law upon the directors of Caremark.

## I. BACKGROUND

For these purposes I regard the following facts, suggested by the discovery record, as material. Caremark, a Delaware corporation with its headquarters in Northbrook, Illinois, was created in November 1992 when it was spun-off from Baxter International, Inc. ("Baxter") and became a publicly held company listed on the New York Stock Exchange. The business practices that created the problem pre-dated the spin-off. During the relevant period Caremark was involved in two main health care business segments, providing patient care and managed care services. As part of its patient care business, which accounted for the majority of Caremark's revenues, Caremark provided alternative site health care services, including infusion therapy, growth hormone therapy, HIV/ AIDS-related treatments and hemophilia therapy. Caremark's managed care services included prescription drug programs and the operation of multi-specialty group practices.

### A. Events Prior to the Government Investigation

A substantial part of the revenues generated by Caremark's businesses is derived from third party payments, insurers, and Medicare and Medicaid reimbursement programs. The latter source of payments are subject to the terms of the Anti–Referral Payments Law ("ARPL") which prohibits health care providers from paying any form of remuner-

---

1. Thirteen of the Directors have been members of the Board since November 30, 1992. Nancy

Brinker joined the Board in October 1993.

ation to induce the referral of Medicare or Medicaid patients. From its inception, Caremark entered into a variety of agreements with hospitals, physicians, and health care providers for advice and services, as well as distribution agreements with drug manufacturers, as had its predecessor prior to 1992. Specifically, Caremark did have a practice of entering into contracts for services (*e.g.*, consultation agreements and research grants) with physicians at least some of whom prescribed or recommended services or products that Caremark provided to Medicare recipients and other patients. Such contracts were not prohibited by the ARPL but they obviously raised a possibility of unlawful "kickbacks."

As early as 1989, Caremark's predecessor issued an internal "Guide to Contractual Relationships" ("Guide") to govern its employees in entering into contracts with physicians and hospitals. The Guide tended to be reviewed annually by lawyers and updated. Each version of the Guide stated as Caremark's and its predecessor's policy that no payments would be made in exchange for or to induce patient referrals. But what one might deem a prohibited *quid pro quo* was not always clear. Due to a scarcity of court decisions interpreting the ARPL, however, Caremark repeatedly publicly stated that there was uncertainty concerning Caremark's interpretation of the law.

To clarify the scope of the ARPL, the United States Department of Health and Human Services ("HHS") issued "safe harbor" regulations in July 1991 stating conditions under which financial relationships between health care service providers and patient referral sources, such as physicians, would *not* violate the ARPL. Caremark contends that the narrowly drawn regulations gave limited guidance as to the legality of many of the agreements used by Caremark that did not fall within the safe-harbor. Caremark's predecessor, however, amended many of its standard forms of agreement with health care providers and revised the Guide in an apparent attempt to comply with the new regulations.

### B. Government Investigation and Related Litigation

In August 1991, the HHS Office of the Inspector General ("OIG") initiated an investigation of Caremark's predecessor. Caremark's predecessor was served with a subpoena requiring the production of documents, including contracts between Caremark's predecessor and physicians (Quality Service Agreements ("QSAs")). Under the QSAs, Caremark's predecessor appears to have paid physicians fees for monitoring patients under Caremark's predecessor's care, including Medicare and Medicaid recipients. Sometimes apparently those monitoring patients were referring physicians, which raised ARPL concerns.

In March 1992, the Department of Justice ("DOJ") joined the OIG investigation and separate investigations were commenced by several additional federal and state agencies.[2]

### C. Caremark's Response to the Investigation

During the relevant period, Caremark had approximately 7,000 employees and ninety branch operations. It had a decentralized management structure. By May 1991, however, Caremark asserts that it had begun making attempts to centralize its management structure in order to increase supervision over its branch operations.

The first action taken by management, as a result of the initiation of the OIG investigation, was an announcement that as of October 1, 1991, Caremark's predecessor would no longer pay management fees to physicians for services to Medicare and Medicaid patients. Despite this decision, Caremark asserts that its management, pursuant to advice, did not believe that such payments were illegal under the existing laws and regulations.

---

2. In addition to investigating whether Caremark's financial relationships with health care providers were intended to induce patient referrals, inquiries were made concerning Caremark's billing practices, activities which might lead to excessive and medically unnecessary treatments for patients, potentially improper waivers of patient co-payment obligations, and the adequacy of records kept at Caremark pharmacies.

During this period, Caremark's Board took several additional steps consistent with an effort to assure compliance with company policies concerning the ARPL and the contractual forms in the Guide. In April 1992, Caremark published a fourth revised version of its Guide apparently designed to assure that its agreements either complied with the ARPL and regulations or excluded Medicare and Medicaid patients altogether. In addition, in September 1992, Caremark instituted a policy requiring its regional officers, Zone Presidents, to approve each contractual relationship entered into by Caremark with a physician.

Although there is evidence that inside and outside counsel had advised Caremark's directors that their contracts were in accord with the law, Caremark recognized that some uncertainty respecting the correct interpretation of the law existed. In its 1992 annual report, Caremark disclosed the ongoing government investigations, acknowledged that if penalties were imposed on the company they could have a material adverse effect on Caremark's business, and stated that no assurance could be given that its interpretation of the ARPL would prevail if challenged.

Throughout the period of the government investigations, Caremark had an internal audit plan designed to assure compliance with business and ethics policies. In addition, Caremark employed Price Waterhouse as its outside auditor. On February 8, 1993, the Ethics Committee of Caremark's Board received and reviewed an outside auditors report by Price Waterhouse which concluded that there were no material weaknesses in Caremark's control structure.[3] Despite the positive findings of Price Waterhouse, however, on April 20, 1993, the Audit & Ethics Committee adopted a new internal audit charter requiring a comprehensive review of compliance policies and the compilation of an employee ethics handbook concerning such policies.[4]

The Board appears to have been informed about this project and other efforts to assure compliance with the law. For example, Caremark's management reported to the Board that Caremark's sales force was receiving an ongoing education regarding the ARPL and the proper use of Caremark's form contracts which had been approved by in-house counsel. On July 27, 1993, the new ethics manual, expressly prohibiting payments in exchange for referrals and requiring employees to report all illegal conduct to a toll free confidential ethics hotline, was approved and allegedly disseminated.[5] The record suggests that Caremark continued these policies in subsequent years, causing employees to be given revised versions of the ethics manual and requiring them to participate in training sessions concerning compliance with the law.

During 1993, Caremark took several additional steps which appear to have been aimed at increasing management supervision. These steps included new policies requiring local branch managers to secure home office approval for all disbursements under agreements with health care providers and to certify compliance with the ethics program. In addition, the chief financial officer was appointed to serve as Caremark's compliance officer. In 1994, a fifth revised Guide was published.

### D. Federal Indictments Against Caremark and Officers

On August 4, 1994, a federal grand jury in Minnesota issued a 47 page indictment charging Caremark, two of its officers (not the firm's chief officer), an individual who had been a sales employee of Genentech,

---

3. At that time, Price Waterhouse viewed the outcome of the OIG Investigation as uncertain. After further audits, however, on February 7, 1995, Price Waterhouse informed the Audit & Ethics Committee that it had not become aware of any irregularities or illegal acts in relation to the OIG investigation.

4. Price Waterhouse worked in conjunction with the Internal Audit Department.

5. Prior to the distribution of the new ethics manual, on March 12, 1993, Caremark's president had sent a letter to all senior, district, and branch managers restating Caremark's policies that no physician be paid for referrals, that the standard contract forms in the Guide were not to be modified, and that deviation from such policies would result in the immediate termination of employment.

Inc., and David R. Brown, a physician practicing in Minneapolis, with violating the ARPL over a lengthy period. According to the indictment, over $1.1 million had been paid to Brown to induce him to distribute Protropin, a human growth hormone drug marketed by Caremark.[6] The substantial payments involved started, according to the allegations of the indictment, in 1986 and continued through 1993. Some payments were "in the guise of research grants", Ind. ¶ 20, and others were "consulting agreements", Ind. ¶ 19. The indictment charged, for example, that Dr. Brown performed virtually none of the consulting functions described in his 1991 agreement with Caremark, but was nevertheless neither required to return the money he had received nor precluded from receiving future funding from Caremark. In addition the indictment charged that Brown received from Caremark payments of staff and office expenses, including telephone answering services and fax rental expenses.

In reaction to the Minnesota Indictment and the subsequent filing of this and other derivative actions in 1994, the Board met and was informed by management that the investigation had resulted in an indictment; Caremark denied any wrongdoing relating to the indictment and believed that the OIG investigation would have a favorable outcome. Management reiterated the grounds for its view that the contracts were in compliance with law.

Subsequently, five stockholder derivative actions were filed in this court and consolidated into this action. The original complaint, dated August 5, 1994, alleged, in relevant part, that Caremark's directors breached their duty of care by failing adequately to supervise the conduct of Caremark employees, or institute corrective measures, thereby exposing Caremark to fines and liability.[7]

On September 21, 1994, a federal grand jury in Columbus, Ohio issued another indictment alleging that an Ohio physician had defrauded the Medicare program by requesting and receiving $134,600 in exchange for referrals of patients whose medical costs were in part reimbursed by Medicare in violation of the ARPL. Although unidentified at that time, Caremark was the health care provider who allegedly made such payments. The indictment also charged that the physician, Elliot Neufeld, D.O., was provided with the services of a registered nurse to work in his office at the expense of the infusion company, in addition to free office equipment.

An October 28, 1994 amended complaint in this action added allegations concerning the Ohio indictment as well as new allegations of over billing and inappropriate referral payments in connection with an action brought in Atlanta, *Booth v. Rankin.* Following a newspaper article report that federal investigators were expanding their inquiry to look at Caremark's referral practices in Michigan as well as allegations of fraudulent billing of insurers, a second amended complaint was filed in this action. The third, and final, amended complaint was filed on April 11, 1995, adding allegations that the federal indictments had caused Caremark to incur significant legal fees and forced it to sell its home infusion business at a loss.[8]

After each complaint was filed, defendants filed a motion to dismiss. According to de-

---

**6.** In addition to prescribing Protropin, Dr. Brown had been receiving research grants from Caremark as well as payments for services under a consulting agreement for several years before and after the investigation. According to an undated document from an unknown source, Dr. Brown and six other researchers had been providing patient referrals to Caremark valued at $6.55 for each $1 of research money they received.

**7.** Caremark moved to dismiss this complaint on September 14, 1994. Prior to that motion, another stockholder derivative action had been filed in the United States District Court for the

Northern District of Illinois, complaining of similar misconduct on the part of Caremark, its Directors, and three employees, as well as several other claims including RICO violations. *Brumberg v. Mieszala,* No. 94 C 4798 (N.D.Ill.). The federal court entered a stay of all proceedings pending resolution of this case.

**8.** On January 29, 1995, Caremark entered into a definitive agreement to sell its home infusion business to Coram Health Care Company for approximately $310 million. Baxter purchased the home infusion business in 1987 for $586 million.

fendants, if a settlement had not been reached in this action, the case would have been dismissed on two grounds. First, they contend that the complaints fail to allege particularized facts sufficient to excuse the demand requirement under Delaware Chancery Court Rule 23.1. Second, defendants assert that plaintiffs had failed to state a cause of action due to the fact that Caremark's charter eliminates directors' personal liability for money damages, to the extent permitted by law.

### E. Settlement Negotiations

In September, following the announcement of the Ohio indictment, Caremark publicly announced that as of January 1, 1995, it would terminate all remaining financial relationships with physicians in its home infusion, hemophilia, and growth hormone lines of business.[9] In addition, Caremark asserts that it extended its restrictive policies to all of its contractual relationships with physicians, rather than just those involving Medicare and Medicaid patients, and terminated its research grant program which had always involved some recipients who referred patients to Caremark.

Caremark began settlement negotiations with federal and state government entities in May 1995. In return for a guilty plea to a single count of mail fraud by the corporation, the payment of a criminal fine, the payment of substantial civil damages, and cooperation with further federal investigations on matters relating to the OIG investigation, the government entities agreed to negotiate a settlement that would permit Caremark to continue participating in Medicare and Medicaid programs. On June 15, 1995, the Board approved a settlement ("Government Settlement Agreement") with the DOJ, OIG, U.S. Veterans Administration, U.S. Federal Employee Health Benefits Program, federal Civilian Health and Medical Program of the Uniformed Services, and related state agencies in all fifty states and the District of Columbia.[10] No senior officers or directors were charged with wrongdoing in the Government Settlement Agreement or in any of the prior indictments. In fact, as part of the sentencing in the Ohio action on June 19, 1995, the United States stipulated that *no senior executive of Caremark participated in, condoned, or was willfully ignorant of wrongdoing in connection with the home infusion business practices.*[11]

The federal settlement included certain provisions in a "Corporate Integrity Agreement" designed to enhance future compliance with law. The parties have not discussed this agreement, except to say that the negotiated provisions of the settlement of this claim are not redundant of those in that agreement.

Settlement negotiations between the parties in this action commenced in May 1995 as well, based upon a letter proposal of the plaintiffs, dated May 16, 1995.[12] These negotiations resulted in a memorandum of understanding ("MOU"), dated June 7, 1995, and the execution of the Stipulation and Agreement of Compromise and Settlement on June 28, 1995, which is the subject of this action.[13] The MOU, approved by the Board on June

---

9. On June 1, 1993, Caremark had stopped entering into new contractual agreements in those business segments.

10. The agreement, covering allegations since 1986, required a Caremark subsidiary to enter a guilty plea to two counts of mail fraud, and required Caremark to pay $29 million in criminal fines, $129.9 million relating to civil claims concerning payment practices, $3.5 million for alleged violations of the Controlled Substances Act, and $2 million, in the form of a donation, to a grant program set up by the Ryan White Comprehensive AIDS Resources Emergency Act. Caremark also agreed to enter into a compliance agreement with the HHS.

11. On July 25, 1995, another shareholder derivative complaint was filed against Caremark and seven of its Directors, asserting allegations related to the Minnesota indictment and the terms of the Government Settlement Agreement. *Lenzen v. Piccolo*, No. 95 CH 7118 (Circuit Court of Cook County, Illinois).

12. No government entities were involved in these separate, but concurrent negotiations.

13. Plaintiffs' initial proposal had both a monetary component, requiring Caremark's director-officers to relinquish stock options, and a remedial component, requiring management to adopt and implement several compliance related measures. The monetary component was subsequently eliminated.

15, 1995, required the Board to adopt several resolutions, discussed below, and to create a new compliance committee. The Compliance and Ethics Committee has been reporting to the Board in accord with its newly specified duties.

After negotiating these settlements, Caremark learned in December 1995 that several private insurance company payors ("Private Payors") believed that Caremark was liable for damages to them for allegedly improper business practices related to those at issue in the OIG investigation. As a result of intensive negotiations with the Private Payors and the Board's extensive consideration of the alternatives for dealing with such claims, the Board approved a $98.5 million settlement agreement with the Private Payors on March 18, 1996. In its public disclosure statement, Caremark asserted that the settlement did not involve current business practices and contained an express denial of any wrongdoing by Caremark. After further discovery in this action, the plaintiffs decided to continue seeking approval of the proposed settlement agreement.

### F. The Proposed Settlement of this Litigation

In relevant part the terms upon which these claims asserted are proposed to be settled are as follows:

1. That Caremark, undertakes that it and its employees, and agents not pay any form of compensation to a third party in exchange for the referral of a patient to a Caremark facility or service or the prescription of drugs marketed or distributed by Caremark for which reimbursement may be sought from Medicare, Medicaid, or a similar state reimbursement program;

2. That Caremark, undertakes for itself and its employees, and agents not to pay to or split fees with physicians, joint ventures, any business combination in which Caremark maintains a direct financial interest, or other health care providers with whom Caremark has a financial relationship or interest, in exchange for the referral of a patient to a Caremark facility or service or the prescription of drugs marketed or distributed by Caremark for

which reimbursement may be sought from Medicare, Medicaid, or a similar state reimbursement program;

3. That the full Board shall discuss all relevant material changes in government health care regulations and their effect on relationships with health care providers on a semi-annual basis;

4. That Caremark's officers will remove all personnel from health care facilities or hospitals who have been placed in such facility for the purpose of providing remuneration in exchange for a patient referral for which reimbursement may be sought from Medicare, Medicaid, or a similar state reimbursement program;

5. That every patient will receive written disclosure of any financial relationship between Caremark and the health care professional or provider who made the referral;

6. That the Board will establish a Compliance and Ethics Committee of four directors, two of which will be non-management directors, to meet at least four times a year to effectuate these policies and monitor business segment compliance with the ARPL, and to report to the Board semi-annually concerning compliance by each business segment; and

7. That corporate officers responsible for business segments shall serve as compliance officers who must report semi-annually to the Compliance and Ethics Committee and, with the assistance of outside counsel, review existing contracts and get advanced approval of any new contract forms.

## II. LEGAL PRINCIPLES

### A. Principles Governing Settlements of Derivative Claims

As noted at the outset of this opinion, this Court is now required to exercise an informed judgment whether the proposed settlement is fair and reasonable in the light of all relevant factors. *Polk v. Good*, Del. Supr., 507 A.2d 531 (1986). On an application of this kind, this Court attempts to protect the best interests of the corporation and its absent shareholders all of whom will

be barred from future litigation on these claims if the settlement is approved. The parties proposing the settlement bear the burden of persuading the court that it is in fact fair and reasonable. *Fins v. Pearlman,* Del.Supr., 424 A.2d 305 (1980).

### B. Directors' Duties To Monitor Corporate Operations

The complaint charges the director defendants with breach of their duty of attention or care in connection with the on-going operation of the corporation's business. The claim is that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance. The complaint thus does not charge either director self-dealing or the more difficult loyalty-type problems arising from cases of suspect director motivation, such as entrenchment or sale of control contexts.[14] The theory here advanced is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment. The good policy reasons why it is so difficult to charge directors with responsibility for corporate losses for an alleged breach of care, where there is no conflict of interest or no facts suggesting suspect motivation involved, were recently described in *Gagliardi v. TriFoods Int'l, Inc.,* Del.Ch., 683 A.2d 1049, 1051 (1996) (1996 Del.Ch. LEXIS 87 at p. 20).

**1. *Potential liability for directoral decisions:*** Director liability for a breach of the duty to exercise appropriate attention may, in theory, arise in two distinct contexts. First, such liability may be said to follow *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss. *See generally* Veasey & Seitz, *The Business Judgment Rule in the Revised Model Act* ... 63 Texas L.Rev. 1483 (1985). The first class of cases will typically be subject to review under the director-protective business judgment rule, assuming the decision made was the product of *a process* that was *either* deliberately considered in good faith or was otherwise rational. See *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984); *Gagliardi v. TriFoods Int'l, Inc.,* Del.Ch., 683 A.2d 1049 (1996). What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions,[15] is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides *no* ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests. To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests.[16] Thus, the busi-

---

14. See *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983) (entire fairness test when financial conflict of interest involved); *Unitrin, Inc. v. American General Corp.,* Del.Supr., 651 A.2d 1361, 1372 (1995) (intermediate standard of review when "defensive" acts taken); *Paramount Communications, Inc. v. QVC Network,* Del.Supr., 637 A.2d 34, 45 (1994) (intermediate test when corporate control transferred).

15. *See* American Law Institute, Principles of Corporate Governance § 4.01(c) (to qualify for business judgment treatment a director must "ration-

ally" believe that the decision is in the best interests of the corporation).

16. The vocabulary of negligence while often employed, *e.g., Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984) is not well-suited to judicial review of board attentiveness, *see, e.g., Joy v. North,* 692 F.2d 880, 885–6 (2d Cir.1982), especially if one attempts to look to the substance of the decision as any evidence of possible "negligence." Where review of board functioning is involved, courts leave behind as a relevant point of reference the decisions of the hypothetical

ness judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions.

■ Indeed, one wonders on what moral basis might shareholders attack a *good faith* business decision of a director as "unreasonable" or "irrational". Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment,* he or she should be deemed to satisfy fully the duty of attention. If the shareholders thought themselves entitled to some other quality of judgment than such a director produces in the good faith exercise of the powers of office, then the shareholders should have elected other directors. Judge Learned Hand made the point rather better than can I. In speaking of the passive director defendant Mr. Andrews in *Barnes v. Andrews,* Judge Hand said:

> True, he was not very suited by experience for the job he had undertaken, but I cannot hold him on that account. After all it is the same corporation that chose him that now seeks to charge him.... Directors are not specialists like lawyers or doctors.... They are the general advisors of the business and if they faithfully give such ability as they have to their charge, it would not be lawful to hold them liable. Must a director guarantee that his judgment is good? Can a shareholder call him to account for deficiencies that their votes assured him did not disqualify him for his office? While he may not have been the Cromwell for that Civil War, Andrews did not engage to play any such role.[17]

In this formulation Learned Hand correctly identifies, in my opinion, the core element of any corporate law duty of care inquiry: whether there was good faith effort to be informed and exercise judgment.

**2. Liability for failure to monitor:** The second class of cases in which director liability for inattention is theoretically possible entail circumstances in which a loss eventuates not from a decision but, from unconsidered inaction. Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention. Legally, the board itself will be required only to authorize the most significant corporate acts or transactions: mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc. As the facts of this case graphically demonstrate, ordinary business decisions that are made by officers and employees deeper in the interior of the organization can, however, vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals. If this case did not prove the point itself, recent business history would. Recall for example the displacement of senior management and much of the board of Salomon, Inc.;[18] the replacement of senior management of Kidder, Peabody following the discovery of large trading losses resulting from phantom trades by a highly compensated trader;[19] or the extensive financial loss and reputational injury suffered by Prudential Insurance as a result its junior officers misrepresentations in connection with the distribution of limited partnership interests.[20] Financial and organizational disasters such as these raise the question, what is

---

"reasonable person", who typically supplies the test for negligence liability. It is doubtful that we want business men and women to be encouraged to make decisions as hypothetical persons of *ordinary* judgment and prudence might. The corporate form gets its utility in large part from its ability to allow diversified investors to accept greater investment risk. If those in charge of the corporation are to be adjudged personally liable for losses on the basis of a substantive judgment based upon what an persons of ordinary or average judgment and average risk assessment talent regard as "prudent" "sensible" or even "rational", such persons will have a strong incentive at the margin to authorize less risky investment projects.

**17.** 298 F. 614, 618 (S.D.N.Y.1924).

**18.** *See, e.g., Rotten at the Core,* the Economist, August 17, 1991, at 69–70; *The Judgment of Salomon: An Anticlimax,* Bus. Week, June 1, 1992, at 106.

**19.** *See* Terence P. Pare, *Jack Welch's Nightmare on Wall Street,* Fortune, Sept. 5, 1994, at 40–48.

**20.** Michael Schroeder and Leah Nathans Spiro, *Is George Ball's Luck Running Out?,* Bus. Week, November 8, 1993, at 74–76; Joseph B. Treaster, *Prudential To Pay Policyholders $410 Million,* New York Times, Sept. 25, 1996, (at D–1).

the board's responsibility with respect to the organization and monitoring of the enterprise to assure that the corporation functions within the law to achieve its purposes?

Modernly this question has been given special importance by an increasing tendency, especially under federal law, to employ the criminal law to assure corporate compliance with external legal requirements, including environmental, financial, employee and product safety as well as assorted other health and safety regulations. In 1991, pursuant to the Sentencing Reform Act of 1984,[21] the United States Sentencing Commission adopted Organizational Sentencing Guidelines which impact importantly on the prospective effect these criminal sanctions might have on business corporations. The Guidelines set forth a uniform sentencing structure for organizations to be sentenced for violation of federal criminal statutes and provide for penalties that equal or often massively exceed those previously imposed on corporations.[22] The Guidelines offer powerful incentives for corporations today to have in place compliance programs to detect violations of law, promptly to report violations to appropriate public officials when discovered, and to take prompt, voluntary remedial efforts.

In 1963, the Delaware Supreme Court in *Graham v. Allis–Chalmers Mfg. Co.*,[23] addressed the question of potential liability of board members for losses experienced by the corporation as a result of the corporation having violated the anti-trust laws of the United States. There was no claim in that case that the directors knew about the behavior of subordinate employees of the corporation that had resulted in the liability. Rather, as in this case, the claim asserted was that the directors *ought to have known* of it and if they had known they would have been under a duty to bring the corporation into compliance with the law and thus save

the corporation from the loss. The Delaware Supreme Court concluded that, under the facts as they appeared, there was no basis to find that the directors had breached a duty to be informed of the ongoing operations of the firm. In notably colorful terms, the court stated that "absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists."[24] The Court found that there were no grounds for suspicion in that case and, thus, concluded that the directors were blamelessly unaware of the conduct leading to the corporate liability.[25]

■ How does one generalize this holding today? Can it be said today that, absent some ground giving rise to suspicion of violation of law, that corporate directors have no duty to assure that a corporate information gathering and reporting systems exists which represents a good faith attempt to provide senior management and the Board with information respecting material acts, events or conditions within the corporation, including compliance with applicable statutes and regulations? I certainly do not believe so. I doubt that such a broad generalization of the *Graham* holding would have been accepted by the Supreme Court in 1963. The case can be more narrowly interpreted as standing for the proposition that, absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf. *See* 188 A.2d at 130–31.

A broader interpretation of *Graham v. Allis–Chalmers*—that it means that a corporate board has no responsibility to assure that appropriate information and reporting sys-

---

**21.** *See* Sentencing Reform Act of 1984, Pub.L. 98–473, Title II, § 212(a)(2) (1984); 18 U.S.C.A. §§ 3551–3656.

**22.** *See* United States Sentencing Commission, Guidelines Manuel, Chapter 8 (U.S. Government Printing Office November 1994).

**23.** Del.Supr., 41 Del.Ch. 78, 188 A.2d 125 (1963).

**24.** *Id.* 188 A.2d at 130.

**25.** Recently, the *Graham* standard was applied by the Delaware Chancery in a case involving Baxter. *In Re Baxter International, Inc. Shareholders Litig.*, Del.Ch., 654 A.2d 1268, 1270 (1995).

tems are established by management—would not, in any event, be accepted by the Delaware Supreme Court in 1996, in my opinion. In stating the basis for this view, I start with the recognition that in recent years the Delaware Supreme Court has made it clear—especially in its jurisprudence concerning takeovers, from *Smith v. Van Gorkom* through *Paramount Communications v. QVC*[26]—the seriousness with which the corporation law views the role of the corporate board. Secondly, I note the elementary fact that relevant and timely *information* is an essential predicate for satisfaction of the board's supervisory and monitoring role under Section 141 of the Delaware General Corporation Law. Thirdly, I note the potential impact of the federal organizational sentencing guidelines on any business organization. Any rational person attempting in good faith to meet an organizational governance responsibility would be bound to take into account this development and the enhanced penalties and the opportunities for reduced sanctions that it offers.

■ In light of these developments, it would, in my opinion, be a mistake to conclude that our Supreme Court's statement in *Graham* concerning "espionage" means that corporate boards may satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.

Obviously the level of detail that is appropriate for such an information system is a question of business judgment. And obvi-

ously too, no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law. But it is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.

Thus, I am of the view that a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards[27]. I now turn to an analysis of the claims asserted with this concept of the directors duty of care, as a duty satisfied in part by assurance of adequate information flows to the board, in mind.

### III. ANALYSIS OF THIRD AMENDED COMPLAINT AND SETTLEMENT

#### A. The Claims

■ On balance, after reviewing an extensive record in this case, including numerous documents and three depositions, I conclude that this settlement is fair and reasonable. In light of the fact that the Caremark Board already has a functioning committee charged with overseeing corporate compliance, the changes in corporate practice that are presented as consideration for the settlement do not impress one as very significant. Nonetheless, that consid-

---

**26.** *E.g., Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985); *Paramount Communications v. QVC Network,* Del.Supr., 637 A.2d 34 (1994).

**27.** Any action seeking recover for losses would logically entail a judicial determination of proximate cause, since, for reasons that I take to be obvious, it could never be assumed that an adequate information system would be a system that would prevent all losses. I need not touch upon

the burden allocation with respect to a proximate cause issue in such a suit. *See Cede & Co. v. Technicolor, Inc.,* Del.Supr., 636 A.2d 956 (1994); *Cinerama, Inc. v. Technicolor, Inc.,* Del. Ch., 663 A.2d 1134 (1994), *aff'd,* Del.Supr., 663 A.2d 1156 (1995). Moreover, questions of waiver of liability under certificate provisions authorized by 8 *Del.C.* § 102(b)(7) may also be faced.

eration appears fully adequate to support dismissal of the derivative claims of director fault asserted, because those claims find no substantial evidentiary support in the record and quite likely were susceptible to a motion to dismiss in all events.[28]

In order to show that the Caremark directors breached their duty of care by failing adequately to control Caremark's employees, plaintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of, although under *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 636 A.2d 956 (1994) this last element may be thought to constitute an affirmative defense.

1. ***Knowing violation for statute:*** Concerning the possibility that the Caremark directors knew of violations of law, none of the documents submitted for review, nor any of the deposition transcripts appear to provide evidence of it. Certainly the Board understood that the company had entered into a variety of contracts with physicians, researchers, and health care providers and it was understood that some of these contracts were with persons who had prescribed treatments that Caremark participated in providing. The board was informed that the company's reimbursement for patient care was frequently from government funded sources and that such services were subject to the ARPL. But the Board appears to have been informed by experts that the company's practices while contestable, were lawful. There is no evidence that reliance on such reports was not reasonable. Thus, this case presents no occasion to apply a principle to the effect that knowingly causing the corporation to violate a criminal statute constitutes a breach of a director's fiduciary duty. *See Roth v. Robertson*, N.Y.Sup.Ct., 64 Misc. 343, 118 N.Y.S. 351 (1909); *Miller v. American Tel. &*

*Tel. Co.*, 507 F.2d 759 (3rd Cir.1974). It is not clear that the Board knew the detail found, for example, in the indictments arising from the Company's payments. But, of course, the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise. Such a requirement would simple be inconsistent with the scale and scope of efficient organization size in this technological age.

2. ***Failure to monitor:*** Since it does appears that the Board was to some extent unaware of the activities that led to liability, I turn to a consideration of the other potential avenue to director liability that the pleadings take: director inattention or "negligence". Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* or in this case, in my opinion only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exits—will establish the lack of good faith that is a necessary condition to liability. Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors.

Here the record supplies essentially no evidence that the director defendants were guilty of a sustained failure to exercise their oversight function. To the contrary, insofar as I am able to tell on this record, the corporation's information systems appear to have represented a good faith attempt to be informed of relevant facts. If the directors did not know the specifics of the activities

---

**28.** *See In Re Baxter International, Inc. Shareholders Litig.*, Del.Ch., 654 A.2d 1268, 1270 (1995). A claim in some respects similar to that here made was dismissed. The court relied, in part, on the fact that the Baxter certificate of incorporation contained a provision as authorized by Section 102(b)(7) of the Delaware General Corporation Law, waiving director liability for due care violations. *Id.* at 1270. That fact was thought to require pre-suit demand on the board in that case.

that lead to the indictments, they cannot be faulted.

The liability that eventuated in this instance was huge. But the fact that it resulted from a violation of criminal law alone does not create a breach of fiduciary duty by directors. The record at this stage does not support the conclusion that the defendants either lacked good faith in the exercise of their monitoring responsibilities or conscientiously permitted a known violation of law by the corporation to occur. The claims asserted against them must be viewed at this stage as extremely weak.

### B. The Consideration For Release of Claim

■ The proposed settlement provides very modest benefits. Under the settlement agreement, plaintiffs have been given express assurances that Caremark will have a more centralized, active supervisory system in the future. Specifically, the settlement mandates duties to be performed by the newly named Compliance and Ethics Committee on an ongoing basis and increases the responsibility for monitoring compliance with the law at the lower levels of management. In adopting the resolutions required under the settlement, Caremark has further clarified its policies concerning the prohibition of providing remuneration for referrals. These appear to be positive consequences of the settlement of the claims brought by the plaintiffs, even if they are not highly significant. Nonetheless, given the weakness of the plaintiffs' claims the proposed settlement appears to be an adequate, reasonable, and beneficial outcome for all of the parties. Thus, the proposed settlement will be approved.

## IV. ATTORNEYS' FEES

The various firms of lawyers involved for plaintiffs seek an award of $1,025,000 in attorneys' fees and reimbursable expenses.[29]

In awarding attorneys' fees, this Court considers an array of relevant factors. *E.g., In Re Beatrice Companies, Inc. Litigation,* Del. Ch., C.A. No. 8248, Allen, C., 1986 WL 4749 (Apr. 16, 1986). Such factors include, most importantly, the financial value of the benefit *that the lawyers work produced;* the strength of the claims (because substantial settlement value may sometimes be produced even though the litigation added little value—*i.e.,* perhaps any lawyer could have settled this claim for this substantial value or more); the amount of complexity of the legal services; the fee customarily charged for such services; and the contingent nature of the undertaking.

In this case no factor points to a substantial fee, other than the amount and sophistication of the lawyer services required. There is only a modest substantive benefit produced; in the particular circumstances of the government activity there was realistically a very slight contingency faced by the attorneys at the time they expended time. The services rendered required a high degree of sophistication and expertise. I am told that at normal hourly billing rates approximately $710,000 of time was expended by the attorneys.

In these circumstances, I conclude that an award of a fee determined by reference to the time expended at normal hourly rates plus a premium of 15% of that amount to reflect the limited degree of real contingency in the undertaking, is fair. Thus I will award a fee of $816,000 plus $53,000 of expenses advanced by counsel.

I am today entering an order consistent with the foregoing.[30]

---

29. Of the total requested amount, approximately $710,000 is designated as reimbursement for the number of hours spent by the attorneys on the case, calculated at their normal billing rate, and $53,000 for out-of-pocket expenses.

30. The court has been informed by letter of counsel that after the fairness of the proposed settlement had been submitted to the court, Caremark was involved in a merger in which its stock was canceled and the holders of its stock became entitled to shares of stock of the acquiring corpo-

ration. No party to this suit, or the surviving corporation, has sought to dismiss this case thereafter on the basis that plaintiffs' have loss standing to sue. As plaintiffs continue to have an equity interest in the entity that owns the claims and more especially because no party has moved for any modification of the procedural setting of the matter submitted, I conclude that any merger that may have occurred is without effect on the decision of the motion or the judgment to be entered.