**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IMG HOLDING LLC, derivatively on behalf of JPMORGAN CHASE & CO., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0522-KSJM |
| JAMES DIMON, STEPHEN B. BURKE, LINDA B. BAMMANN, TODD A. COMBS, JAMES S. CROWN, ALICIA B. DAVIS, TIMOTHY P. FLYNN, ALEX GORSKY, MELLODY HOBSON, MICHAEL A. NEAL, PHEBE N. NOVAKOVIC, and VIRGINIA M. ROMETTY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| JPMORGAN CHASE & CO., | ) ) | |
| Nominal Defendant. | ) | |

**ORDER RESOLVING DEFENDANTS' MOTION TO DISMISS[1]**

1.     Plaintiff IMG Holding LLC ("Plaintiff") owns stock in JPMorgan Chase & Co. ("JPM"), a multinational financial services company.

2.     Along with several other large banks, JPM owns Zelle, a digital banking platform that allows customers to electronically transfer money with relative ease to other consumers.  Zelle is regulated by the federal Electronic Fund Transfer Act (the

---

[1] The facts are drawn from the Verified Complaint and documents it incorporates by reference. C.A. No. 2023-0522-KSJM, Docket ("Dkt.") 1 ("Compl.").

"EFTA") and Regulation E, which clarifies responsibilities under the EFTA.[2]  Under the EFTA and Regulation E, a bank must reimburse customers for unauthorized electronic transfers within certain time frames or face civil and criminal penalties for noncompliance.

3.  Zelle is susceptible to fraud.  Hackers have found a way to send themselves funds from someone else's Zelle account to their own.  Once money is sent through Zelle, it is generally not recoverable by the sender.  National media outlets reported on instances of Zelle fraud.  The Complaint cites to five news articles published between May 2021 and June 2022 that reported on Zelle fraud and four specific customer experiences.

4.  In 2022, the United States Senate Committee on Banking, Housing, and Urban Affairs (the "Senate Committee") opened an investigation into unauthorized electronic transfers on Zelle and industry-wide non-compliance with the EFTA and Regulation E.  The Senate Committee sent a letter to Zelle leadership on April 25, 2022, regarding the news articles.

5.  The Senate Committee then sent a letter to JPM's CEO James Dimon on July 7, 2022, requesting details and statistics on Zelle fraud claims.  The Senate Committee asked questions regarding JPM's compliance with the EFTA and Regulation E.  On September 22, 2022, JPM provided responses to the Senate Committee.  Plaintiff describes these responses as "incomplete."[3]  That same day,

---

[2] 15 U.S.C. § 1693 *et seq.*; 12 C.F.R. § 1005.1 *et seq.*

[3] Compl. ¶ 69.

Dimon testified before the Senate Committee, which included Senator Elizabeth Warren. Dimon promised to provide the Senate Committee with additional details unaddressed in JPM's September 22, 2022 written response. Plaintiff alleged that after the hearing, JPM chose not to provide those details.

6. Senator Warren issued a report on Zelle fraud and industry non-compliance with the EFTA and Regulation E on October 3, 2022 (the "Warren Report"). The Warren Report stated that "fraud and theft are rampant on Zelle[,]" "[b]anks are not repaying customers who contest 'unauthorized' Zelle payments – potentially violating federal law," and PNC Bank, U.S. Bank, Truist, and Bank of America "reimbursed customers for only 47% of the dollar amount of cases in which customers reported unauthorized payments on Zelle[.]"[4] The Warren Report did not include JPM in the last statistic.

7. The Warren Report stated that JPM failed to respond adequately to the Senator's July 7, 2022 letter request. National media outlets covered the report. On October 26, 2022, Senator Warren asked the Consumer Financial Protection Bureau (the "CFPB") to take action on Zelle fraud and cited JPM's failure to furnish the Senate Committee with more information. The CFPB had separately released a report on Zelle fraud in May 2022 (the "CFPB Report"). The CFPB Report referred to "some financial institutions," but did not mention JPM specifically.[5]

---

[4] *Id.* ¶ 80.

[5] *Id.* ¶ 45.

8. On November 9, 2022, Plaintiff sent JPM a demand to inspect books and records pursuant to 8 *Del. C.* § 220 (the "Demand"). Plaintiff's stated purpose was to investigate possible breaches of fiduciary duty in connection with potential EFTA violations. JPM did not respond initially due to an internal misrouting. Plaintiff filed an enforcement action on December 6, 2022. JPM then produced certain documents responsive to the Demand. In this litigation, Plaintiff alleges that JPM did not respond to the Demand in full, but Plaintiff voluntarily dismissed its enforcement action on May 12, 2023, after receiving JPM's production.[6]

9. Plaintiff filed this action on May 12, 2023, asserting a single count for breach of fiduciary duty under *Caremark*[7] against the JPM Board of Directors (the "Board"): Dimon, Stephen B. Burke, Linda B. Bammann, Todd A. Combs, James S. Crown, Alicia B. Davis, Timothy P. Flynn, Alex Gorsky, Mellody Hobson, Michael A. Neal, Phebe N. Novakovic, and Virginia M. Rometty ("Defendants").[8] Defendants moved to dismiss the Complaint on August 1, 2023, pursuant to Court of Chancery Rules 23.1 and 12(b)(6).[9] The parties fully briefed the motion, and the court held oral argument on January 31, 2024.[10]

---

[6] *Id.* ¶¶ 40, 99; C.A. No. 2022-1123-KSJM, Dkt. 12, Notice of Voluntary Dismissal.

[7] *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del. Ch. 1996).

[8] Compl. ¶¶ 50–54.

[9] Dkt. 13 ("Defs.' Opening Br.").

[10] Dkt. 20 ("Pl.'s Answering Br."); Dkt. 25 ("Defs.' Reply Br.").

10.     "A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[11]  "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[12]  Because derivative litigation impinges on the managerial freedom of directors in this way, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[13]  The demand requirement is a substantive principle under Delaware law.[14]

---

[11] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review.  *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814).  The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary.  746 A.2d at 253–54.  The seven partially overruled precedents otherwise remain good law.

[12] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[13] *Id.*

[14] *Id.*; *see* Ct. Ch. R. 23.1(a).

11.     Rule 23.1 is the "procedural embodiment of this substantive principle."[15] It provides that a stockholder plaintiff must "state with particularity: . . . any effort by the derivative plaintiff to obtain the desired action from the entity; and . . . the reasons for not obtaining the action or not making the effort."[16] A stockholder choosing to allege demand futility must meet the "heightened pleading requirements,"[17] alleging "particularized factual statements that are essential to the claim."[18] A plaintiff is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[19]

12.     In *Zuckerberg*, the Delaware Supreme Court adopted the "universal test" for demand futility that blends elements of the two precursor tests: *Aronson*[20] and *Rales*.[21]   When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

---

[15] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[16] Ct. Ch. R. 23.1(a)(1).

[17] *Zuckerberg*, 250 A.3d at 876.

[18] *Brehm*, 746 A.2d at 254.

[19] *Id.* at 255.

[20] 473 A.2d 805 (Del. 1984).

[21] 634 A.2d 927 (Del. 1993).

6

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[22]

13. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[23] While the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[24]

14. When Plaintiff filed this action, Defendants comprised the entirety of the Board. To adequately allege demand futility, Plaintiff must plead particularized facts creating reason to doubt that at least six of the twelve Defendants were incapable of impartially considering a demand.

15. To meet its burden, Plaintiff advances arguments under the second *Zuckerberg* test, contending that all members of the demand board face a substantial likelihood of liability from Plaintiff's *Caremark* claim.[25] Where, as here, a plaintiff's basis for arguing demand futility centers on a substantial likelihood of liability resulting from the derivative claims at issue, the demand analysis effectively folds

---

[22] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (quoting *Zuckerberg*, 250 A.3d at 890); *accord* Ct. Ch. R. 23.1.

[23] *Zuckerberg*, 262 A.3d at 1041 ("The Court of Chancery's refined articulation of the *Aronson* standard helps to address these issues. Nonetheless, this refined standard is consistent with *Aronson*, *Rales*, and their progeny. Thus, cases properly applying those holdings remain good law.").

[24] *Id.*

[25] Compl. ¶¶ 113–14.

into an analysis of the strength of the underlying claims. In this case, therefore, the *Zuckerberg* analysis hinges on whether Plaintiff has adequately alleged its *Caremark* claim.

16. A *Caremark* claim "seeks to hold directors accountable for the consequences of a corporate trauma."[26] To adequately allege such a claim, a plaintiff must allege that the board had some level of involvement in the trauma.[27] *Caremark* describes the test as requiring that the directors "knew or . . . should have known" about the risk leading to the trauma.[28] *Stone* clarified that liability under *Caremark* requires a showing of bad faith—"that the directors knew that they were not discharging their fiduciary obligations."[29] At the pleading stage, the plaintiff must allege facts from which the court can reasonably infer that a fiduciary acted in bad faith.[30]

17. *Stone* identified two subspecies of *Caremark* claims. To state a *Caremark* claim, a plaintiff must allege particularized facts that establish either (1) "the directors utterly failed to implement any reporting or information system or

---

[26] *La. Mun. Police Empls.' Ret. Sys. v. Pyott,* 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *see also Horman v. Abney*, 2017 WL 242571, at *5 (Del. Ch. Jan. 19, 2017) ("*Caremark* claims inevitably arise in the midst of or directly following 'corporate trauma' of some sort or another.").

[27] *Pyott*, 46 A.3d at 340.

[28] *Caremark*, 698 A.2d at 971.

[29] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Pyott*, 46 A.3d at 340–41 (discussing the "actual knowledge" requirement of *Caremark* as clarified by *Stone*).

[30] *Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019) (quoting *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007)).

controls, *or* [(2)] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[31] These two subspecies are colloquially referred to as information-systems claims and red-flags claims.[32]

18.    Plaintiff asserts a red-flags claim, alleging that the Board ignored red flags concerning JPM's failure to comply with the EFTA and Regulation E.

19.    A plaintiff can plead a "red flags" *Caremark* claim by alleging "particularized facts that the board knew of red flags but consciously disregarded them in bad faith."[33]    The intuitive notion underlying the red-flags theory is that "sophisticated and well-advised individuals like corporate directors do not customarily concede violations of positive law," and so a plaintiff must plead facts and circumstances sufficient for a court to infer this conduct.[34] "[A] *Caremark* plaintiff can plead that 'the directors were conscious of the fact that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in defiance of their duties."[35]

---

[31] *Stone*, 911 A.2d at 370 (emphasis in original).

[32] *See In re McDonald's Corp. S'holder Deriv. Litig.,* 289 A.3d 343, 363–64 (Del. Ch. 2023) (labeling first species of claims as "information-system" claims and second species as "red-flag" claims).

[33] *City of Detroit Police & Fire Ret. Sys. on Behalf of NiSource, Inc. v. Hamrock,* 2022 WL 2387653, at *20 (Del. Ch. June 30, 2022) (quoting *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou,* 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020)).

[34] *Id.* (quoting *South v. Baker,* 62 A.3d 1, 14–15 (Del. Ch. 2012)); *see also In re Gen. Motors, Deriv. Litig.,* 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015) (observing that red flags "are a proxy for pleading knowledge").

[35] *Id.* (quoting *David B. Shaev Profit Sharing Acct. v. Armstrong,* 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006)).

A plaintiff must allege that a board "had notice of serious misconduct and simply failed to investigate . . . even if the committee or board was well constituted and was otherwise functioning."[36]

20. Plaintiff alleges that JPM violated and continues to violate the EFTA and Regulation E by failing to resolve unauthorized electronic transfer claims and provisionally credit consumer accounts within 10 business days;[37] by failing to resolve unauthorized electronic transfer claims within 45 days;[38] and by failing to reimburse victims of unauthorized electronic fund transfers after more than 45 days.[39] Plaintiff's red-flags theory is that the Board knew of these violations from the media and the Warren and CFPB Reports, and that the Board failed to respond, thus constituting bad faith.

21. Plaintiff's theory is not supported by the allegations in the Complaint. The Complaint relies on and repeats statements from the four media reports. The anecdotes in the articles do not describe any failures by JPM to investigate or reimburse customers properly. Quite the opposite—the media reports reflect that JPM investigated and acted on the claims.[40] It is hard to tell whether the transfers

---

[36] *Id.*

[37] Compl. ¶ 36 (alleging a violation of 15 U.S.C. § 1693f(a)).

[38] *Id.* ¶ 37 (alleging a violation of 15 U.S.C. § 1693f(c)).

[39] *Id.* ¶ 38 (alleging a violation of 15 U.S.C. § 1693f(c)).

[40] *See* Defs.' Opening Br., Exs. F–H (full versions of the articles cited by Plaintiff). The articles are incorporated into the complaint. *See Morrison v. Berry,* 191 A.3d 268, 275, n. 20 (Del. 2018) ("[w]hen a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint; this is true even where the documents are not expressly

discussed in the media reports were "unauthorized" for purposes of the EFTA and Regulation E. And the media reports do not describe any delay that would constitute non-compliance with the time frames established by the EFTA or Regulation E.

22. The Warren and CFPB Reports similarly fail to demonstrate that JPM violated federal regulations. The general allegations of these Reports are directed to the banking industry at large. Aspects of the Reports specific to certain banks omitted information pertaining to JPM. It is hard to build a case of bad faith against the JPM Board based on these documents. Were the court to so infer, then by logical extension, Plaintiff's theory would support a viable *Caremark* claim against any bank implicated by the general allegations made in the Reports. That is not tenable.

23. To avoid this outcome, Plaintiff points to the fact that JPM did not produce information requested by the Senate Committee. Plaintiff seeks and adverse inference from this conduct, arguing that "[o]ne can easily infer that JPM refused to provide the documents that Dimon had promised . . . because those documents would have demonstrated that JPM was failing to reimburse its customers for unauthorized electronic transactions in compliance with the Act[.]"[41] Although at the dismissal stage all inferences are taken in favor of Plaintiff, this is a stretch too far. JPM's

---

incorporated into or attached to the complaint." (internal citations omitted)). The articles show that JPM reimbursed customers, investigated claims as per their policies, and declined to reimburse a customer where the investigation found no evidence of fraud. Far from showing an absence of compliance under the EFTA, these articles raise an inference that JPM has working EFTA policies and practices. The court cannot reasonably infer that JPM was violating federal law on a widespread, systematic basis where the documents on which Plaintiff relies show that JPM was compliant.

[41] Compl. ¶ 78.

September 22, 2022 letter provided detailed information on JPM's practices and its policies.[42]

24.     Plaintiff further argues that the court should infer that JPM violated federal law, and that Defendants knew about it and consciously failed to act in bad faith, because "the documents [JPM] produced in response to [the Section 220 demand] contain no reference whatsoever" to the Regulation E deadlines.[43]  But the documents produced in response to the Demand show that, on October 17, 2022, the Board discussed efforts to address fraud on Zelle and reimbursements.[44]  And the policies and procedures themselves show that JPM had processes for dealing with unauthorized transfers.[45]

25.     Moreover, Plaintiff had an opportunity to press for greater scope of inspection but failed to do so.  Plaintiff tries to spin this in its favor, arguing that JPM *must* have engaged in widespread misconduct because it failed to produce documents that Plaintiff requested in the Demand.  Alternatively, Plaintiff argues that the bank must not have had access to documents necessary to assess its compliance, and so it "has not attempted to monitor its compliance with [] statutory deadlines, and . . . has hit the snooze button on this wake-up call to begin monitoring its compliance with the

---

[42] Defs.' Opening Br., Ex. J.

[43] Pl.'s Answering Br. at 13.

[44] Defs.' Opening Br., Ex. O.

[45] Defs.' Opening Br., Exs. L–N.  That the Regulation E procedures do not specifically refer to the time limits is not enough for the court to infer a red flag. Compl. ¶¶ 111, 115.

deadlines in [EFTA] and Regulation E."[46] JPM, however, took the reasonable position that certain of the documents requested were outside the scope of the Section 220 inspection, and so did not provide what Plaintiff asked for.[47] The court did not have a chance to resolve that issue at the Section 220 phase because Plaintiff voluntarily dismissed its action. In essence, Plaintiff is asking the court to grant an adverse inference against Defendants because they did not produce documents that *Plaintiff decided not to pursue.* That does not work.

26. Thus, neither the allegations nor any inferences therefrom constitute red flags sufficient to support a *Caremark* claim.

27. For these reasons, Plaintiff has failed to show a substantial likelihood of liability under *Caremark* for any of the defendants. Consequently, demand was not futile, and the case is dismissed under Rule 23.1.

28. In its answering brief, Plaintiff requested leave to replead should the court dismiss this action.[48] Because Plaintiff filed an answering brief, dismissal of the complaint is "with prejudice . . . unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances."[49] Plaintiff has not shown any good cause, and so the action is dismissed with prejudice.[50]

---

[46] Pl.'s Answering Br. at 15.

[47] Compl. ¶ 41.

[48] Pl.'s Answering Br. at 29–33.

[49] Ct. Ch. R. 15(aaa).

[50] Plaintiff's argument is that Defendants might ignore red flags in the future. That is not good cause.

29.     Plaintiff also moved for leave to file a supplemental brief based on JPM's February 16, 2024 annual report.[51]  The request is based on one paragraph in the annual report that makes note of JPM responding to government inquiries regarding some Zelle transfers.  This admission does not change the court's analysis.  Plaintiff's motion for leave to file a supplemental brief is denied.  The defendants' motion to dismiss is granted.

*/s/ Kathaleen St. J. McCormick*
Chancellor Kathaleen St. J. McCormick
Dated: April 16, 2024

---

[51] Dkt. 33.