# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOEL B. RITCHIE, Derivatively On Behalf Of CORCEPT THERAPEUTICS, INC.,

        Plaintiff,

        v.

G. LEONARD BAKER, JOSEPH K. BELANOFF, SEAN MADUCK, DAVID L. MAHONEY, CHARLES ROBB, DANIEL N. SWISHER, and JAMES N. WILSON,

        Defendants,

    and

CORCEPT THERAPEUTICS, INC.,

        Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2022-0102-BWD

## MEMORANDUM OPINION GRANTING MOTION TO DISMISS

Date Submitted: May 13, 2025
Date Decided: July 22, 2025

Brian D. Long, LONG LAW, LLC, Wilmington, DE; OF COUNSEL: Rusty E. Glenn, SHUMAN, GLENN & STECKER, Denver, CO; Brett D. Stecker, SHUMAN, GLENN & STECKER, Ardmore, PA; *Attorneys for Plaintiff Joel B. Ritchie*.

David E. Ross, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; OF COUNSEL: Corey Worcester, Hope D. Skibitsky, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY; *Attorneys for Defendants*.

**DAVID, V.C.**

The plaintiff in this derivative suit is a stockholder of Corcept Therapeutics, Inc. ("Corcept" or the "Company"), a pharmaceutical company that derives most of its revenue from a single drug. Korlym is an oral treatment for patients with endogenous Cushing's syndrome, a rare disease that occurs when the body is exposed to high levels of cortisol. In early 2019, the Southern Investigative Reporting Foundation and Blue Orca Capital published investigative reports claiming that Corcept had increased its profits by marketing Korlym for off-label uses in violation of federal law. Several Corcept stockholders promptly filed lawsuits in federal district court, including a securities class action before the U.S. District Court for the Northern District of California that survived a motion to dismiss. In February 2023, that securities class action settled in exchange for $14 million, paid entirely by Corcept's insurers.

In this action, the stockholder plaintiff seeks to recover on behalf of the Company for breaches of fiduciary duty related to the alleged off-label marketing practices. The defendants have moved to dismiss the complaint for failure to adequately plead demand futility and for failure to state a claim. The plaintiff responds that making a demand would have been futile because a majority of the board at the time he filed suit faced a substantial likelihood of liability on his claim for breach of fiduciary duty. The plaintiff advances three (largely inconsistent) theories to support that claim: (1) the defendants breached their fiduciary duties by

1

failing to adequately oversee operations at the Company that resulted in a corporate trauma (the "*Caremark* theory"); (2) the defendants breached their fiduciary duties by causing the Company to violate positive law (the "*Massey* theory"); and (3) the defendants breached their fiduciary duties by deliberately issuing false or misleading disclosures (the "*Malone* theory").

None of the plaintiff's theories supports a viable claim for breach of fiduciary duty against the members of the demand board. Plaintiff's *Caremark* theory fails because (1) far from supporting a reasonable inference that the board "utterly failed" to implement appropriate reporting or information systems, the complaint affirmatively alleges that the board was "well-informed" of "all significant Korlym-related matters," and (2) the complaint separately fails to adequately allege that the directors knew of evidence of illegal marketing practices, yet acted in bad faith by consciously disregarding their duty to address the alleged misconduct.

Plaintiff's *Massey* theory, a more "extreme" variation on his *Caremark* theory, also fails. The complaint falls short of alleging "red flags" that should have alerted the directors to an illegal off-label marketing scheme, let alone that the directors purposely caused the Company to break the law. And the *Malone* theory fails for largely the same reasons. Without sufficient allegations that the defendants knew about the alleged marketing scheme, the complaint does not plead the requisite

2

scienter to support a *Malone* theory based on purportedly false disclosures about the Company's marketing practices.

Because the complaint fails to plead that a majority of the demand board faces a substantial likelihood of liability for non-exculpated claims, or otherwise could not bring its business judgment to bear, demand is not excused as futile. The complaint is dismissed under Court of Chancery Rule 23.1.

## I. BACKGROUND[1]

### A. The Parties

Corcept is a publicly traded Delaware corporation headquartered in California. Compl. ¶ 28. Joel B. Ritchie ("Plaintiff") has owned Corcept stock continuously from January 2016 through the filing of the Complaint. *Id.* ¶ 27.

Defendants G. Leonard Baker, Joseph K. Belanoff, Sean Maduck, David L. Mahoney, Charles Robb, Daniel N. Swisher, and James N. Wilson have served on Corcept's board of directors (the "Board") or as Corcept officers since at least 2015. *Id.* ¶¶ 29–35. Baker, Belanoff, Mahoney, Swisher, and Wilson (the "Director

---

[1] The following facts are taken from Plaintiff's Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference. Verified S'holder Deriv. Compl. [hereinafter Compl.], Dkt. 1; *see Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del. 1996))).

Defendants") and non-parties Gregg Alton, Gillian Cannon, Joshua Murray, and Kimberly Park (collectively, the "Demand Board") served on the Board when the Complaint was filed. *Id.* ¶ 236.

Belanoff co-founded Corcept and has served as its Chief Executive Officer since 1999. *Id.* ¶¶ 30, 45. Robb served as Corcept's Chief Financial Officer from September 2011 until March 2021, when he became Chief Business Officer. *Id.* ¶ 33; Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Verified S'holder Deriv. Compl. [hereinafter OB] at 6, Dkt. 15. Maduck has served as Corcept's Vice President, Sales & Marketing; Senior Vice President, Commercial; Chief Commercial Officer; and President of Endocrinology. Compl. ¶ 31; OB at 6.

### B. The FDA Approves Korlym To Treat Endogenous Cushing's Syndrome And Corcept Engages Dohmen As Its Specialty Pharmacy.

Corcept is a pharmaceutical company that derives most of its revenue from a single drug—Korlym, an oral treatment for patients with endogenous Cushing's syndrome (also known as "hypercortisolism"), a rare[2] disease that occurs when the body is exposed to high levels of cortisol produced by the adrenal glands for a sustained period. Compl. ¶¶ 3–4, 51. "Endogenous Cushing's syndrome has well-

---

[2] During the U.S. Food and Drug Administration's ("FDA") clinical review of Korlym, one doctor estimated that approximately 20,000 people in the United States have Cushing's syndrome. Compl. ¶ 66.

established diagnosis and treatment guidelines that require multiple diagnostic tests be performed to confirm the presence of Cushing's syndrome." *Id.* ¶ 70. An endocrinologist (a specialist in hormone-related conditions) may treat the condition through surgery, radiation, and medication. *Id.* ¶¶ 51–52.

In July 2007, the FDA granted "orphan drug" designation to Korlym to treat endogenous Cushing's syndrome. *Id.* ¶ 48. "Designation of Korlym as an orphan drug conferred market exclusivity, tax credits, research support and other benefits to Corcept under the Orphan Drug Act of 1983." *Id.* ¶ 49. In February 2012, the FDA approved Korlym for one limited purpose—to control hyperglycemia "in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery." *Id.* ¶¶ 61–62. The FDA granted Corcept marketing exclusivity for seven years. *Id.* ¶¶ 49, 99.

Although a physician may exercise his or her medical judgment to prescribe a drug for a use that is not approved by the FDA (an "off-label use"), federal law prohibits a drug manufacturer from marketing a drug for a use that is not approved by the FDA ("off-label marketing"). To limit Korlym's availability for off-label use, the FDA required Corcept to "establish a distribution program through a central pharmacy" that receives prescriptions from physicians and delivers Korlym directly to patients. *Id.* ¶ 88. In May 2013, Corcept entered into a services agreement with

specialty pharmacy[3] Dohmen Life Sciences Services, LLC ("Dohmen"), which required Dohmen to design and develop an "exclusive distribution and patient services program . . . for furnishing [Korlym] in the United States to individuals who register and are accepted for participation by [Dohmen]." *Id.* ¶¶ 7, 92–93.

Under the services agreement, Corcept remained responsible for marketing Korlym. *Id.* ¶ 94. Corcept's marketing efforts initially targeted 300 endocrinologists who specialized in diagnosing and treating seventy percent of the endogenous Cushing's syndrome patients in the U.S. *Id.* ¶¶ 7, 102, 129.

Between 2012 and 2016, Corcept's revenues grew from $3.3 million to more than $81 million. *Id.* ¶ 7. In late 2015, Corcept replaced its marketing team with a new team led by Maduck. *Id.* ¶ 106. Corcept renewed its services agreement with Dohmen in May 2016. *Id.* ¶¶ 96, 118.

## C.     Corcept Changes Specialty Pharmacies.

On February 10, 2017, the Board held a quarterly meeting during which it "received an update on both Cushing's syndrome and the Life Cycle management of Korlym." *Id.* ¶ 206. The Board's audit committee (the "Audit Committee"), comprising Mahoney and Swisher, also held a meeting, during which Corcept

---

[3] "Specialty pharmacies exist to fill the gap where local pharmacies refuse to carry rare medications that are seldom prescribed, like Korlym. Specialty pharmacies work with the prescriber and insurance companies to negotiate the price and seek approval for the patients." Compl. ¶ 89.

management compared Corcept's performance against its 2016 and 2017 commercial goals, "including the Company's revenue, commercial tablets, 4th shipment retention, enrollments, revenue per tablet, average refill dose and free tablet goals," as well as "further anticipated changes in the Company's sales organization and its possible expansion." *Id.* ¶¶ 219–21 (emphasis removed). At that meeting, management also reported that Dohmen had materially breached its services agreement with Corcept.[4] *Id.* ¶ 221.

On August 2, Corcept filed a Quarterly Report with the Securities and Exchange Commission ("SEC") disclosing that, "[b]ecause a large percentage of the people who suffer from Cushing's syndrome remain undiagnosed or are inadequately treated, [Corcept] ha[d] developed and continue[d] to refine and expand programs to educate the medical community and patients about diagnosis of this syndrome and to increase awareness regarding the role of cortisol modulators to treat the disease." *Id.* ¶ 167. The Quarterly Report noted that, "[a]lthough [Corcept] believe[s] [its] marketing materials and training programs for physicians do not constitute 'off-label' promotion of Korlym, the FDA may disagree." *Id.*

On August 4, Corcept terminated its services agreement with Dohmen and entered into a services agreement under which Optime Care, LLC ("Optime") would

---

[4] On June 29, Corcept sent Dohmen a letter summarizing Dohmen's material breaches of the service agreement. *Id.* ¶ 115.

7

serve as Corcept's specialty pharmacy. *Id.* ¶¶ 107, 115. Optime was incorporated in 2015 and is run by former Dohmen employees. *Id.* ¶¶ 107–08. Corcept is Optime's first and only customer. *Id.* ¶ 107.

On September 14, the Board held a quarterly meeting during which it received a "Cushing's syndrome Commercial Update" from management and was informed that Corcept had "moved to Optime Care, our new Specialty Pharmacy." *Id.* ¶ 207 (emphasis removed). Management also reported that Corcept had put "[s]trategies in place" to "increase Korlym penetration," including "increasing penetration across all Cushing's syndrome etiologies through increased physician outreach and education." *Id.* (emphasis removed).

### D. Korlym Sales Drive Corcept's Revenue Growth.

On November 1, the Audit Committee held a quarterly meeting at which management presented "a detailed report on the Company's quarterly financial report and its related SEC filings, including risk factors related to Korlym." *Id.* ¶ 220. The next day, Corcept issued a press release with its Quarterly Report, quoting Belanoff as stating: "[m]ore and more physicians recognize that Cushing's syndrome sometimes goes undiagnosed and are screening more aggressively for the disease" and "[t]here is also growing awareness that, for many patients, cortisol modulation with Korlym is the best medical treatment." *Id.* ¶ 169. On an analyst call later that day, Belanoff attributed the "strong growth in Korlym revenue in the

8

third quarter" to "growing awareness amongst physicians of Korlym's efficacy, the increasing frequency with which physicians are screening for and treating patients with hypercortisolism and our commercial organization[']s focus[] on the endocrinologists who treat most patients with hypercortisolism." *Id.* ¶ 170. Corcept's Quarterly Report again disclosed that, "[a]lthough [Corcept] believe[s] [its] marketing materials and training programs for physicians do not constitute 'off-label' promotion of Korlym, the FDA may disagree." *Id.* ¶ 172.

At a December 13 meeting, the Board received a "Commercial Update" presentation reporting that Korlym prescriptions written by primary care providers had risen nationally from 18 to 38 percent between the first and third quarters of 2017. *Id.* ¶¶ 206, 209. The presentation suggested that "[h]ypercortisolism may be more prevalent th[a]n previously thought." OB, Ex. 2 at 21.

On February 1, 2018, Corcept issued a press release with its Quarterly Report quoting Belanoff as stating: "[m]ore and more physicians realize that hypercortisolism frequently goes undiagnosed and as a consequence are screening more patients for the disease." Compl. ¶ 174. On February 22, Corcept issued a press release announcing its 2017 financial results in which Belanoff reiterated: "[p]hysicians . . . are more frequently screening patients for the disease" and "[f]or many of the patients they identify, physicians are choosing cortisol modulation as the optimum medical treatment." *Id.* ¶ 175. On an analyst call later that day, Robb

9

remarked that Corcept's fourth quarter revenue grew 25% compared to the third quarter, "due entirely to increased Korlym sales," and Belanoff explained that "physicians are increasingly aware that hypercortisolism is dangerous and should be treated" and "are screening more patients who exhibit symptoms of the disorder." *Id.* ¶¶ 176–77.

On February 28, Corcept filed its Annual Report with the SEC. *Id.* ¶ 178. The Annual Report repeated that, "[b]ecause many people who suffer from Cushing's syndrome are undiagnosed or inadequately treated, [Corcept] ha[s] developed and continue[s] to refine and expand programs to educate physicians and patients about diagnosis of this syndrome." *Id.* Like Corcept's prior Quarterly Reports, the Annual Report again disclosed that, "[a]lthough [Corcept] believe[s] [its] marketing materials and training programs for physicians do not constitute 'off-label' promotion of Korlym, the FDA may disagree." *Id.*

On May 8, Corcept issued a press release with its quarterly results, again attributing growth in Korlym sales to physicians' increased awareness of hypercortisolism. *Id.* ¶ 180. On an analyst call later that day, Robb reiterated that Corcept's revenue growth represented "broad-based organic growth" from "[m]ore physicians prescribing Korlym to more patients," and Belanoff explained that "[p]hysicians are increasingly aware that hypercortisolism is a serious condition that merits treatment and are screening more patients for the disorder." *Id.* ¶¶ 181–82.

On August 8, the Board held a quarterly meeting during which it "discuss[ed] strategies in place (as well as some new ones being explored) that [management] believe[d] w[ould] help reach more potential prescribers, and drive [Corcept's] future brand growth." *Id.* ¶ 215 (emphasis removed). Those strategies included Corcept's "expanded speaker's bureau" program through which it pays physicians to participate in educational events. *Id.* Around this time, the Board also reviewed a letter "preview[ing] important questions concerning the Company's Korlym strategy." *Id.* ¶ 213. The letter explained that "[t]he breadth of our business continues to grow but last year's largest prescribers have moderated their activity to average levels and no new very large prescribers have taken their place," and asked: "[s]hould we remain focused on endocrinologists, or do we make a more concerted effort to engage with primary care physicians from the outset?" *Id.* ¶¶ 213–14 (emphasis removed).

On August 9, Corcept issued a press release with its Quarterly Report quoting Belanoff as stating: "[o]ur Cushing's syndrome franchise continues its significant growth, driven by physicians' increasing realization that hypercortisolism is a serious disorder and that cortisol modulation is the best medical therapy for many patients" and "[w]e are confident this shift in medical practice will continue." *Id.* ¶ 185. On an analyst call later that day, Robb again attributed Corcept's revenue increase to "more physicians prescribing Korlym to more patients." *Id.* ¶ 186.

11

On November 1, the day before Corcept filed its Quarterly Report with the SEC, Robb repeated on an analyst call that Corcept's revenue increase was due to "more physicians in every part of the country prescribing Korlym to more patients." *Id.* ¶¶ 190–91. Maduck described Corcept's efforts to educate doctors about Cushing's syndrome, explaining that Corcept "educate[s] physicians on a spectrum of disease and the appropriate screening tools that are available to them" and "[m]any more sick patients are being diagnosed today because of our educational efforts." *Id.* ¶ 190. Maduck also noted that "99% of our Korlym . . . prescription[s] . . . are on-label and we continue to see favorable insurance reimbursement." *Id.*

At a November 27 meeting, the Board received a "Commercial Board Update" that identified Korlym's "commercial challenges in 2018," including "fewer high volume prescribers" and "flat hypercortisolism patient enrollments." *Id.* ¶¶ 206, 216.

### E. SIRF And Blue Orca Publish Reports Accusing Corcept Of Marketing Korlym For Off-Label Uses.

On January 25, 2019, the Southern Investigative Reporting Foundation published a report (the "SIRF Report") claiming "that Corcept was engaged in a 'pay-for-play' scheme by which it reimbursed physicians through honoraria payments in exchange for Korlym prescriptions, and that Corcept's revenues were driven by off-label Korlym prescriptions." *Id.* ¶¶ 14, 195–96. The SIRF Report described an increase in deaths reported in the FDA's Adverse Events Reporting

12

System in 2017, including seventeen deaths after patients used Korlym for "an unknown indication." *Id.* ¶¶ 15, 157. On January 31, Corcept issued a press release announcing selected financial results and forecasting full-year 2019 revenues of $285 to $315 million, which were markedly lower than analyst expectations. *Id.* ¶ 16.

On February 5, activist investment firm Blue Orca Capital ("Blue Orca") released an investigative piece (the "Blue Orca Report") reporting that Optime "is an undisclosed related party" of Corcept and claiming that Corcept's relationship with Optime presented "a material risk that [Corcept] is using its captured pharmacy to boost sales, hide losses, or engage in other financial shenanigans." *Id.* ¶¶ 17, 198. Blue Orca also posted a YouTube video of an investigative call in which Optime employees purported to work for Corcept. *Id.* ¶¶ 199–200.

The same day, Corcept filed a Current Report on Form 8-K with the SEC, attaching a white paper responding to the Blue Orca Report. *Id.* ¶ 201; OB, Ex. 7. The white paper stated:

> **Speculators wrongly claim** that there are not enough patients with Cushing's syndrome (the life-threatening disease which Korlym treats) to account for our revenue—and so we must be selling for inappropriate, unapproved uses, such as the prevention of weight gain.
>
> **In fact**, there [are] at least 10,000 patients in the United States—and according to recent reports in scientific journals, probably several times more than 10,000 patients—in need of medical therapy for the disease. In short, there are a lot more patients with Cushing's syndrome than are required to account for our revenue. . . .

13

**Speculators wrongly claim** that clusters of Korlym prescriptions in rural and suburban areas mean that Corcept is bribing (or duping) unsophisticated small-town physicians to prescribe Korlym.

**In fact**, Cushing's syndrome affects patients in <u>every</u> community. When physicians screen for the disease (which often masquerades as difficult-to-treat cases of hypertension, diabetes and other common disorders), they almost always identify patients. A geographic "cluster" of Korlym prescriptions is merely evidence that physicians in a particular area are diligently diagnosing and treating patients.

**Speculators wrongly claim**, based on a misrepresentation of government prescription and Sunshine Act payment data, that we pay doctors to prescribe Korlym.

**In fact**, we do not. We enlist experienced physicians to educate their colleagues about Cushing's syndrome and Korlym and to provide us with important advice about our clinical trials. We pay fair market rates for these services—nothing more. Our choice of physicians has nothing to do with their prescribing behavior. To insinuate otherwise, as speculators do, is a grotesque slur against skilled, well-meaning physicians. . . .

**Speculators wrongly claim** that we promote Korlym for unapproved, "off-label" uses.

**In fact**, we do not. Literally, ninety-nine percent (99%) of the Korlym we sell goes to patients whose diagnosis matches Korlym's FDA-approved label. Insurance companies require proof of this diagnosis before agreeing to cover the cost of Korlym. Patients who do not have a properly documented diagnosis of Cushing's syndrome rarely receive reimbursement.

OB, Ex. 7 at 4–5; *see also* Compl. ¶¶ 201, 211.

## F. Stockholder Plaintiffs File Lawsuits And Plaintiff Demands Books And Records.

On March 14, 2019, Corcept stockholders filed a securities class action complaint in the U.S. District Court for the Northern District of California (the "Securities Class Action"), asserting "claims for violations of the federal securities laws against Corcept[,] . . . Belanoff, Maduck, and Robb" premised on allegations that Corcept had engaged in, and failed to disclose, a "pervasive Company-wide off-label marketing scheme" for Korlym. Compl. ¶¶ 223–24 (emphasis removed); OB at 11.

In addition, Corcept stockholders filed multiple lawsuits in the U.S. District Court for the District of Delaware, asserting breach of fiduciary duty claims premised on the Director Defendants' involvement in the alleged off-label marketing scheme (the "District of Delaware Actions"). Defs.' Mot. to Proceed in One Jurisdiction ¶ 7, Dkt. 21.

On December 9, 2020, Plaintiff made a demand pursuant to 8 *Del. C*. § 220 to inspect Corcept's books and records concerning the Company's marketing of Korlym, practices and procedures employed by Corcept's sales representatives, Corcept's relationship with Optime, and other allegations asserted in the SIRF Report and the Blue Orca Report. Compl. ¶ 203.

On August 24, 2021, the U.S. District Court for the Northern District of California granted in part and denied in part a motion to dismiss the Securities Class

15

Action, concluding that the "[p]laintiffs ha[d] adequately alleged at the motion to dismiss stage that Corcept engaged in an off-label marketing scheme of Korlym." *Id.* ¶¶ 223–24.

### G.  Procedural History

On January 31, 2022, Plaintiff initiated this action through the filing of the Complaint.  The Complaint alleges that the Director Defendants breached their fiduciary duties by (1) "fail[ing] to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls" concerning Corcept's marketing practices and compliance with FDA regulations, (2) "causing the Company to engage in the illicit sales practices in violation of U.S. law," and (3) issuing false and misleading disclosures concerning Corcept's compliance with FDA regulations regarding off-label marketing.  *Id.* ¶¶ 250–61.

The parties agreed to stay this action until the close of fact discovery in the Securities Class Action.  *See* Dkt. 4.  In February 2023, the Securities Class Action settled for $14 million paid entirely by Corcept's insurers.  OB at 13.

On March 22, 2024, the Court lifted the stay, Dkt. 8, and on May 3, Defendants moved to dismiss the Complaint (the "Motion to Dismiss").[5]  Defendants

---

[5] On June 7, Plaintiff filed his answering brief in opposition to the Motion to Dismiss.  Pl. Joel B. Ritchie's Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified S'holder

16

then filed a Motion to Proceed in One Jurisdiction, asking the Court to confer with the U.S. District Court for the District of Delaware. Dkt. 21. After conferring, both courts determined that proceedings would continue here through resolution of the Motion to Dismiss. Dkts. 40–42.

This action was reassigned to me on January 8, 2025. Dkt. 36. The Court heard oral argument on the Motion to Dismiss on May 13. Dkt. 46.

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim and Rule 23.1 for failure to plead demand futility.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). "In order for a stockholder to divest the directors of their authority to control [a] litigation asset and bring a derivative action on behalf of the corporation," the stockholder must either make a demand on the company's board of directors or show that demand would be futile.

---

Deriv. Compl. [hereinafter AB], Dkt. 17. On June 28, Defendants filed their reply brief in further support of the Motion to Dismiss. Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.'s Verified S'holder Deriv. Compl., Dkt. 22.

17

*Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017) (first citing Ct. Ch. R. 23.1(a); and then citing *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988)).

Plaintiff here did not make a pre-suit demand on the Demand Board; he instead asserts that making a demand would have been futile. Compl. ¶ 237. To plead demand futility, a complaint must allege "particularized factual statements that are essential to the claim." *Brehm*, 746 A.2d at 254. "In assessing demand futility, the court 'is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice.'" *In re Transunion Deriv. S'holder Litig.*, 324 A.3d 869, 883 (Del. Ch. 2024) (citing *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021)). Alleged "[f]acts are considered 'in their totality,'" drawing reasonable inferences in the plaintiff's favor, but "[c]onclusory allegations 'are not considered as expressly pleaded facts or factual inferences.'" *Id.* (citations omitted).

When evaluating allegations of demand futility, our Court considers, on a director-by-director basis,

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that

18

would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.*

Because the Demand Board comprised nine members, to adequately allege demand futility, Plaintiff must plead particularized facts supporting an inference that at least five directors were incapable of impartially considering a demand. Plaintiff does not argue that any member of the Demand Board received a material personal benefit, or lacked independence from someone who received a material personal benefit, from the misconduct alleged in the Complaint. Instead, Plaintiff argues that the five members of the Demand Board who are Defendants in this action face a substantial likelihood of liability in connection with his claims. Compl. ¶ 243. "Where, as here, a plaintiff's basis for arguing demand futility centers on a substantial likelihood of liability resulting from the derivative claims at issue, the demand analysis effectively folds into an analysis of the strength of the underlying claims as to the Demand Board members." *In re Plug Power Inc. S'holder Deriv. Litig.*, 2025 WL 1277166, at *9 (Del. Ch. May 2, 2025).

As noted above, the Complaint alleges a single claim for breach of fiduciary duty against the Director Defendants. Plaintiff advances three theories to support that claim: (1) the Director Defendants breached their fiduciary duties by failing to adequately oversee operations at the Company that resulted in a corporate trauma (the "*Caremark* theory"); (2) the Director Defendants breached their fiduciary duties by causing the Company to violate positive law (the "*Massey* theory"); and (3) the Director Defendants breached their fiduciary duties by deliberately issuing false or misleading disclosures (the "*Malone* theory").

**A.    The Complaint Fails To Adequately Allege That The Director Defendants Face A Substantial Likelihood Of Liability Under *Caremark* or *Massey*.**

The Complaint alleges that, "[i]n breach of their fiduciary duties, the [Director] Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls"—a so-called "*Caremark* claim." Compl. ¶ 254.

In *Caremark*, Chancellor Allen considered a claim that "directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Though the claim at issue did not implicate blatant self-dealing, the Chancellor explained that a director's duty of loyalty to the corporation also

"includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards." *Id.* at 970. "If *Caremark* means anything, it is that a corporate board must make a good faith effort to exercise its duty of care." *See Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019). *Caremark* explains when the directors' failure to act crosses the line from an exculpated claim for breach of the duty of care (when the failure to act amounts to gross negligence) to a non-exculpated claim for breach of the duty of loyalty (when the failure to act amounts to a bad-faith failure to advance the corporation's best interests). A director acting with fidelity to the corporation cannot turn a blind eye to wrongdoing, then seek protection from an exculpatory provision after the misconduct results in "enormous legal liability." *Caremark*, 698 A.2d at 967.

I pause to note that oversight liability under *Caremark* is an ill fit for the facts alleged here because Corcept has not suffered "enormous legal liability," or indeed any corporate trauma. *Id.*; *see, e.g.*, *Plug Power Inc.*, 2025 WL 1277166, at *11 ("A *Caremark* claim 'seeks to hold directors accountable for the consequences of a corporate trauma[.]'"); *Clem v. Skinner*, 2024 WL 668523, at *1 (Del. Ch. Feb. 19, 2024) (observing that "[t]he few [*Caremark* claims] deemed viable concern severe corporate trauma"). To the contrary, the Complaint alleges that off-label marketing

21

practices dramatically increased the Company's revenue from $81 million in 2016 to $251 million in 2018. Compl. ¶ 9. The notion that the corporation should recover for that "harm"—when the alleged misconduct at issue has not resulted in civil or criminal fines or penalties, and the Securities Class Action resolved in exchange for a $14 million payment funded entirely by carriers—defies common sense.

In any event, assuming *Caremark* is the right framework to assess Plaintiff's claim, the bar for pleading such a claim is a high one:

> [*Caremark*] stems from the core mandate in 8 *Del. C.* § 141(a) that the board is charged with overseeing the corporation's business and affairs. Delaware law presumes that directors are discharging this responsibility in good faith and with reasonable care, even if their actions turn out poorly in hindsight.
>
> Thus, the threshold for liability based on failed oversight "is quite high" and requires a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight." Directors who "try" to implement and attend to a "reasonable board-level system of monitoring and reporting" have met their baseline duty. Though directors may strive to exceed this bar, they cannot be held liable unless their conduct falls beneath it.

*Transunion*, 324 A.3d at 884 (citations omitted). To state a claim under "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment,"[6] a plaintiff must allege particularized facts sufficient to show that "(a) the directors utterly failed to implement any reporting or information system or

---

[6] *Caremark*, 698 A.2d at 967.

controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

As explained below, the Complaint fails to state a claim under either prong of *Caremark*.

**1. The Complaint Does Not Allege That The Director Defendants Utterly Failed To Implement Any Reporting Or Information System Or Controls.**

To state an "information systems" claim under the first *Caremark* prong, "a plaintiff must plead with particularity that the directors completely failed 'to implement any reporting or information system or controls.'" *Plug Power Inc.*, 2025 WL 1277166, at \*12 (citing *Marchand*, 212 A.3d at 821). "[O]nly a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Id.* (citing *Caremark*, 698 A.2d at 971).

This Court has previously observed that a plaintiff who advances theories under *Caremark*'s first and second prongs typically loses on the first, as "the plaintiff must concede the existence of a board-level monitoring system to plead under prong two that the board ignored red flags generated by that system." *City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at \*12 (Del. Ch. June 30, 2022). "Plaintiff falls into that trap here." *Id.* The Complaint alleges that an Audit

Committee of the Board responsible for overseeing "the Company's compliance with legal and regulatory requirements" held regular quarterly meetings during which management presented "detailed report[s]" on "risk factors related to Korlym." Compl. ¶¶ 42, 220, 248; AB at 30.[7] The Complaint also alleges that the Board itself held quarterly meetings during which it "received . . . update[s] on both Cushing's syndrome and the Life Cycle management of Korlym." Compl. ¶ 206.[8] In fact, the Complaint affirmatively alleges that:

> [**T**]*he Board was routinely briefed on all Korlym-related matters*, including, (i) the Speaker's Bureau and educational offerings; (ii) top prescribers and those doctors' Korlym sales; (iii) the Optime pharmacy creation and the reasons for the switch from Dohmen; (iv) Korlym revenue, total tablet sales, average refill doses, revenue per tablet and other commercial and marketing information related to Korlym; (v) and the massive increase in prescriptions coming from personal care physicians over endocrinologists.

*Id.* ¶ 24 (emphasis added); *see also, e.g.*, *id.* ¶¶ 211–15 (alleging the Board was apprised of Corcept's marketing strategy); *id.* ¶¶ 207–15 (alleging the Board was apprised of Corcept's outreach to physicians and education programs); *id.* ¶¶ 214–

---

[7] *See also* Compl. ¶¶ 42–43 (alleging that the Audit Committee is responsible for "oversee[ing] the accounting and financial reporting processes of the Company and audits of its financial statements," among other things). The Complaint alleges that during the relevant period, the Audit Committee met on February 10 and November 1, 2017, and January 31, May 7, July 27, and August 1, 2018. *Id.* ¶¶ 219–20.

[8] The Complaint alleges that during the relevant period, the Board received updates on Cushing's syndrome and Korlym on February 10, May 24, and December 13, 2017, April 18, August 8, and November 27, 2018, and May 18, 2019. *Id.* ¶ 206.

24

17 (alleging the Board was aware of prescriber "whales" for Korlym); *id.* ¶¶ 207–08 (alleging the Board was aware of Corcept's decision to change specialist pharmacies). Those allegations show the Board did *not* "utterly fail" to implement any reporting or information system or controls relating to Korlym and the Company's marketing practices.

Although the Complaint concedes that the Board instituted some information systems, Plaintiff contends that the Board faced a heightened duty of oversight that it failed to satisfy. Plaintiff argues that compliance with FDA marketing regulations was "mission critical" to the Company "[b]ecause Korlym was Corcept's sole commercialized product that generated all its revenue," and the Board was therefore required to specifically "set aside a portion of [its] meetings" to discuss that issue. AB at 48, 52–53.

The concept of "mission critical" compliance risk arose in *Marchand v. Barnhill*, 212 A.3d 805. In that case, the Delaware Supreme Court concluded that stockholder plaintiffs adequately alleged directors of Blue Bell Creameries, an ice cream manufacturer that exposed consumers to a *listeria*-infected product, breached their duty of loyalty by failing to form a board committee to address food safety, implement regular protocols requiring management to keep the board apprised of food safety compliance, or regularly discuss food safety issues. *Id.* at 822–24. Rejecting the defendants' argument that the directors had satisfied their duties by

25

discussing the company's "general operations" with management, the Supreme Court explained that, "[w]hen a plaintiff can plead an inference that a board has undertaken *no efforts* to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made the good faith effort that *Caremark* requires." *Id.* at 822, 824 (emphasis added).

While the Complaint here alleges that legally marketing its primary drug was "essential and mission critical" for Corcept, it does *not* allege that the Board undertook "no efforts" to inform itself of that "intrinsically critical" issue. Again, it alleges the opposite—that "*the [Director] Defendants were well-informed* during the Relevant Period *of all significant Korlym-related matters* which took place at the Company." Compl. ¶ 204. The Complaint therefore fails to plead an "information systems" claim under the first prong of *Caremark*.

### 2. The Complaint Does Not Allege That The Director Defendants Failed To Monitor Corcept's Compliance With FDA Marketing Regulations.

To state a "red-flags" claim under the second *Caremark* prong, a plaintiff must allege "(1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation." *In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723,

26

at *2 (Del. Ch. June 16, 2017) (citation omitted).  In other words, "Plaintiff[] must 'plead [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial "red flag"—yet acted in bad faith by consciously disregarding its duty to address that misconduct.'" *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020) (citations omitted). "This Court has noted that 'red flags are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer,' keeping in mind that 'the careful observer is one whose gaze is fixed on the company's mission critical regulatory issues.'" *In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *14 (Del. Ch. Aug. 17, 2020) (quoting *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13 (Del. Ch. Oct. 1, 2019)).

In the following analysis of alleged "red flags," I do not opine on whether the Complaint adequately alleges that Corcept has, in fact, engaged in off-label marketing practices.  As Plaintiff points out, the U.S. District Court for the Northern District of California, applying federal law, denied in part a motion to dismiss the Securities Class Action, concluding that the "[p]laintiffs ha[d] adequately alleged at the motion to dismiss stage that Corcept engaged in an off-label marketing scheme of Korlym."  Compl. ¶¶ 223–24.  Defendants, of course, vehemently deny those allegations, which, again, have not resulted in civil penalties, fines, or other corporate trauma to the Company.  Here, I assume that the Complaint adequately

27

alleges off-label marketing activity and focus instead on Plaintiff's allegations that the Director Defendants "turn[ed] a conscious blind eye to [that] illicit off-label marketing scheme" when the following "red flags" should have alerted them to the alleged wrongdoing: (1) Corcept marketed Korlym to nonspecialist physicians; (2) Korlym sales came from prescriber "whales"; and (3) Corcept transitioned from Dohmen to Optime as its specialty pharmacy.  AB at 49.

### a.    Marketing to physicians other than endocrinologists

Plaintiff argues that the Board should have suspected off-label marketing when it learned that Corcept was marketing Korlym to physicians other than specialist endocrinologists.  Plaintiff points to (1) a December 13, 2017 presentation to the Board reporting an increase in Korlym prescriptions written by primary care providers between the first and third quarters of 2017, and (2) an August 2018 letter to the Board asking whether Corcept should keep its marketing strategy "focused on endocrinologists" or if it should "make a more concerted effort to engage with primary care physicians from the outset?"  Compl. ¶¶ 20, 209, 213.  Plaintiff argues that:

> A reasonable director, when told by the FDA that Corcept's sole drug had been approved only for exceptionally rare endogenous Cushing's syndrome cases, and whose total addressable market was estimated by the FDA at no more than 1 to 2 patients per million, would at minimum investigate why management shifted marketing from Specialist Endocrinologists to general practitioners who likely had very few or zero patients with Endogenous Cushing's syndrome.

AB at 54–55 (emphasis removed).

Corcept's efforts to broaden its marketing strategy for Korlym to include nonspecialist physicians do not constitute a "red flag" from which the Board should have suspected illegal activity. For one, although Plaintiff alleges that seventy percent of cases of hypercortisolism are treated by specialist endocrinologists, that means thirty percent of cases *could* be treated by nonspecialist physicians. Compl. ¶ 7; *see also id.* ¶ 214 (alleging that "primary care doctors . . . don't have *significant* numbers of patients with Cushing's syndrome," but *not* that nonspecialist physicians have *no* patients with Cushing's syndrome) (emphasis added). Moreover, the Board materials on which Plaintiff relies show that the Board was told the market for on-label Korlym prescriptions was larger than initially anticipated. *See, e.g.*, OB, Ex. 2 at 21 (December 13, 2017 presentation suggesting that "[h]ypercortisolism may be more prevalent than previously thought"); *id.*, Ex. 3 at 16 (February 7, 2018 presentation stating the hypercortisolism market included "~40,000+ eligible hypercortisolism patients"). Thus, nothing about Corcept's decision to market to nonspecialist physicians implies scienter on the part of the Director Defendants.

The August 2018 letter to the Board likewise did not serve as a "red flag."[9] That letter asked if Corcept's marketing strategy should "remain focused on endocrinologists" or "make a more concerted effort to engage with primary care physicians from the outset?" Compl. ¶¶ 20, 213. Plaintiff views that question as a wink and a nod to management's *real* query: "whether Corcept should target doctors who likely had no patients with endogenous Cushing's syndrome and, as a necessary result, market Korlym for off-label use." AB at 57 (emphasis removed); *see also id.* at 59 ("[T]he Director Defendants understood they were really being asked whether Corcept should market Korlym for off-label use."); Compl. ¶ 213. Even under a plaintiff-friendly pleading standard, the Court cannot make that inferential leap. The Complaint fails to allege facts supporting a reasonable inference that the Board should have viewed Corcept's marketing strategy as anything more than an attempt to capture the entire market for Cushing's syndrome patients.

### b. Prescriber "whales"

Plaintiff next contends that Corcept's revenue growth was driven in part by a small number of providers who wrote a disproportionate number of prescriptions for Korlym. According to Plaintiff, the presence of those prescriber "whales" should

---

[9] At oral argument, Plaintiff identified the August 2018 letter as the "biggest red flag" that should have alerted the Board to the Company's illegal off-label marketing practices. *See* Tr. of 5-13-2025 Oral Arg. on Pending Mots. to Dismiss 65:16–23, Dkt. 46.

have alerted the Board to Corcept's off-label marketing practices. AB at 55; Compl. ¶ 214.[10]

The Director Defendants' knowledge of prescriber "whales" does not support a reasonable inference that the Director Defendants also knew Corcept was engaged in illegal marketing. Even assuming the Complaint alleges facts supporting an inference that those "whales" *prescribed* Korlym for an off-label use—which is not illegal[11]—that alone does not support a further inference that the Board knew Corcept *marketed* Korlym for an off-label use, particularly when the Complaint simultaneously alleges that Corcept's reliance on "whales" *decreased* over time. *See, e.g.*, Compl. ¶ 216 (November 27, 2018 Commercial Board Update reporting "fewer high volume prescribers and a "sharp decline in enrollments from 2017 top prescribers"). Such an inference "cannot hold up under the demanding Rule 23.1

---

[10] To show the Board was aware of these "whales," Plaintiff points to (1) the August 2018 letter informing the Board that "last year's largest prescribers have moderated their activity to average levels and no new very large prescribers have taken their place," (2) a November 27, 2018 "Commercial Board Update" reporting "fewer high volume prescribers," and (3) a 2019 "Budget and Revenue" presentation to the Board "positively" reporting that Corcept "ha[d] a more dispersed prescriber base, [and] [was] less reliant on whales." Compl. ¶¶ 214–17.

[11] Plaintiff also argues that the Director Defendants should have suspected Corcept was marketing to prescriber "whales" for off-label use because three doctors who wrote a disproportionate number of prescriptions for Korlym also received payments through Corcept's honoraria program. Importantly, however, the Complaint does not allege that the Director Defendants were *aware* of those payments. *See* AB at 55–56.

31

analysis, which requires specific factual allegations in order to draw an inference of bad faith on the part of directors." *MetLife Inc.*, 2020 WL 4746635, at *16.

### c.      Changing specialty pharmacies

Finally, Plaintiff argues that Corcept's change from Dohmen to Optime as its specialty pharmacy was a red flag that should have alerted the Director Defendants to an off-label marketing scheme.

This argument fails because the Complaint does not allege facts suggesting that the Board was aware of any illegal purpose behind Corcept's decision to change specialty pharmacies. Instead, it alleges that the Director Defendants were told Corcept changed specialty pharmacies due to Dohmen's material breaches of its services agreement. The Complaint alleges that on February 10, 2017, Corcept management informed the Audit Committee of "material breaches that Dohmen ha[d] committed" under its services agreement with Corcept. Compl. ¶ 221. According to the Complaint, "[t]he . . . Defendants claimed that Dohmen had made systematic errors since 2013, including supposedly losing 'almost 250 Korlym tablets' in the second half of 2013," made "reporting errors" in the first quarter of 2014, and was "unsuited for the task and ineffective." *Id.* ¶¶ 116–17.

The Complaint further alleges that the full Board was informed of Corcept's change in specialist pharmacy in a September 14, 2017 presentation that stated:

> On August 10th, we moved to Optime Care, our new Specialty
> Pharmacy. We were given less than 48 hours to transition 750+

32

patients, and we were not provided with complete patient data from Dohmen. We are very pleased with how the transition went (given the circumstances) and our progress to-date.

*Id.* ¶ 207 (emphasis removed). Nothing in that update put the Board on notice that Corcept was using Optime to facilitate an illegal off-label marketing scheme. "Without a pleading of something that the Board ignored, even though the allegation concerns a mission critical compliance risk, it is not reasonably conceivable that" Corcept's change in specialty pharmacy "constituted a red flag." *Chou*, 2020 WL 5028065, at *19.

Plaintiff has therefore failed to demonstrate that a majority of the Demand Board faces a substantial likelihood of liability on a *Caremark* theory.

### 3. The Complaint Fails To Allege That The Director Defendants Purposely Caused The Company To Break The Law.

A "*Massey* claim" represents "an extreme version" of the scenarios contemplated in *Caremark*, premised on the notion that "Delaware law does not charter law breakers." *Transunion*, 324 A.3d at 885; *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011). To state a *Massey* claim, a plaintiff must allege "that directors and officers purposely caused the corporation to break the law in pursuit of greater profits." *Transunion*, 324 A.3d at 886. Alleging that directors purposely caused the company to violate the law is an even higher burden

33

than alleging that the directors acted in bad faith by consciously disregarding their duty to identify and address such a violation.

Plaintiff alleges in conclusory fashion that the Director Defendants intentionally "caus[ed] the Company to engage in . . . illicit sale practices." Compl. ¶ 255. But as explained above, the Complaint falls short of alleging red flags that should have alerted the Director Defendants to an illegal scheme, let alone that the Director Defendants knew about and purposely caused the violations. *See Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *25 (Dec. 18, 2017) (dismissing a *Massey* claim where "there [we]re no allegations suggesting that any of [the company's] officers or directors viewed themselves (or [the company]) as above the law"). The *Massey* theory therefore fails.

**B.  The Complaint Fails To Adequately Allege That The Director Defendants Face A Substantial Likelihood Of Liability On A Disclosure Claim.**

Plaintiff separately contends that the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duty of disclosure. The crux of the claim is that Corcept falsely disclosed in SEC filings, in press releases, and on analyst conference calls that the Company's "marketing materials and training programs for physicians d[id] not constitute 'off-label' promotion of Korlym" and "99% of [Corcept's] Korlym patients [we]re on label," while attributing Corcept's revenue growth to the "increasing willingness of physicians to screen patients for

34

Cushing's syndrome," when in fact, Corcept's growth was driven by undisclosed, illegal off-label marketing practices. Compl. ¶¶ 166–94.

"Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). "Where (like here) the disclosures at issue do not concern a request for stockholder action, . . . a plaintiff [must] demonstrate scienter—*i.e.*, that the directors 'deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'" *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *12 (Del. Ch. Aug. 25, 2021), *aff'd*, 279 A.3d 356 (Del. 2022). "Because [Corcept]'s certificate of incorporation includes a Section 102(b)(7) provision,[12] the [P]laintiff[] 'must plead particularized factual allegations that 'support the inference that the disclosure violation was made in bad faith, knowingly or intentionally' to establish demand futility.'" *Id.* (citing *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009)).

---

[12] *See* Corcept Therapeutics, Inc., Annual Report (Form 10-K), Ex. 3.1 (Feb. 26, 2025). "The court may take judicial notice of the certificate [of incorporation] in deciding a motion to dismiss." *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995) (citing *In re Wheelabrator Techs. Inc. S'holder Litig.*, 1992 WL 212595, at *11 (Del. Ch. Sept. 1, 1992)).

To determine if allegedly misleading statements or omissions were made in bad faith, the Court must assess the Director Defendants' state of mind. "A plaintiff must plead with particularly that directors 'had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves.'" *Id.* (citing *Citigroup*, 964 A.2d at 134). "A plaintiff also must allege 'sufficient board involvement in the preparation of the disclosures' to 'connect the board to the challenged statements.'" *Id.* (citations omitted).

The premise underlying all of Plaintiff's disclosure theories is that Corcept falsely disclosed that it was not engaged in illegal off-label marketing practices. As explained above, the Complaint fails to adequately allege that the Director Defendants actually knew of an off-label marketing scheme, *see* pp. 33–34, *supra*, or that they acted in bad faith by failing to implement reporting systems or respond to red flags that would have alerted them to such a scheme.[13] *See* pp. 23–33 *supra*. Accordingly, the Complaint also fails to allege that the Director Defendants acted with the requisite scienter to support a *Malone* claim.

---

[13] Plaintiff faces an uphill battle to plead that the Director Defendants knew Corcept's disclosures were false, given his other allegations that the Board failed to adequately monitor the affairs of the Company. *See In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *15–16 (Del. Ch. Jan. 31, 2022) (explaining that the plaintiffs' *Caremark* and *Malone* theories were "fundamentally inconsistent, suggesting that the plaintiffs have generally failed to meet the stringent pleading requirements of Rule 23.1"), *aff'd*, 285 A.3d 1204 (Del. 2022).

Thus, Plaintiff has failed to demonstrate that a majority of the Demand Board faces a substantial likelihood of liability based on disclosure violations.

## III. CONCLUSION

The Complaint fails to allege particularized facts supporting an inference that a majority of the Demand Board faced a substantial likelihood of liability on a non-exculpated claim. As a result, the Motion to Dismiss is GRANTED and the Complaint is DISMISSED under Court of Chancery Rule 23.1.